**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**

| | |
|---|---|
| RICHARD POPE, Individually and On Behalf of All Others Similarly Situated, | ) ) ) **Case No.** ) |
| Plaintiff, | ) ) **CLASS ACTION COMPLAINT** ) |
| v. | ) ) **JURY TRIAL DEMANDED** ) |
| GENERAL MOTORS COMPANY, DANIEL F. AKERSON, MARY T. BARRA, DANIEL AMMANN, and CHARLES K. STEVENS III, | ) ) ) ) ) |
| Defendants. | ) ) |

**CLASS ACTION COMPLAINT**

Plaintiff Richard Pope ("Plaintiff"), individually and on behalf of all other persons similarly situated, by his undersigned attorneys, for his complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding General Motors Company ("GM" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on

1

the Internet.  Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased or otherwise acquired GM securities between February 27, 2012 and May 24, 2017, both dates inclusive (the "Class Period"), seeking to recover damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder, against the Company and certain of its top officials.

2.     General Motors Company designs, builds, and sells cars, trucks, crossovers, and automobile parts. The Company offers vehicle protection, parts, accessories, maintenance, satellite radio, and automotive financing. General Motors provides its vehicles and services worldwide.

3.     Founded in 1897, GM is headquartered in Detroit, Michigan.  The Company's stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "GM."

4.     Throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operational and compliance policies.  Specifically, Defendants made false and/or misleading

2

statements and/or failed to disclose that: (i) the Company installed at least three distinct defeat devices in over 700,000 trucks with Duramax diesel engines from 2011 to 2016 in order to cheat emissions tests in the U.S.; (ii) consequently, the GM trucks at issue emit up to five times the legal limit of nitrogen oxide pollutants; and (iii) as a result of the foregoing, GM's public statements were materially false and misleading at all relevant times.

5.   On May 25, 2017, *Bloomberg* reported that a consumer lawsuit had been filed against GM for installing multiple defeat devices in two models of heavy-duty trucks with the Duramax diesel engine from 2011-2016. The lawsuit[1] alleges that GM's unlawful, unfair, deceptive, and otherwise defective emission controls affect model year 2011-2016 GM Sierra 2500HD and 3500 HD trucks and GM Silverado 2500 HD and 3500 HD trucks.

6.   According to the lawsuit, extensive testing of a 2013 Silverado 2500 diesel—a vehicle representative of the class of Duramax diesel engines present in both the Chevrolet Silverado and GMC Sierra model years 2011 to 2016— indicated as follows: (1) the vehicle produces emissions above the certification tests at temperatures above the certification range (86ºF); (2) the vehicle produces higher emissions when temperatures are below the certification test range (68ºF); and (3) the vehicle produces higher emissions occur after the vehicle has been run

---

[1] *Fenner et al. v. General Motors LLC*, Case No. 2:17-cv-11661 (E.D. Mich. May 25, 2017).

for 200-500 seconds of steady speed operation on average by a factor of 4.5 in all temperature windows. These test results confirmed the presence of three distinct defeat devices, which enable the vehicle to meet emissions standards in the test temperature range, while allowing two to five times the legal amount of nitrogen-oxide pollutants to be emitted at all other times.

7.     On this news, GM's share price fell $0.60, or 1.81%, to close at $32.60 on May 25, 2017.

8.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.     The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and Section 27 of the Exchange Act.

11.    Venue is proper in this Judicial District pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b).   GM's principal executive offices are located within this judicial district.

12. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

13. Plaintiff, as set forth in the attached Certification (**Exh. 1**), acquired GM securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14. Defendant GM is headquartered in Detroit, Michigan, with principal executive offices at 300 Renaissance Center, Detroit, Michigan 48265. GM's shares trade on the NYSE under the ticker symbol "GM."

15. Defendant Mary T. Barra ("Barra") has served as the Company's Chief Executive Officer ("CEO") since January 15, 2014.

16. Defendant Charles K. Stevens III ("Stevens") has served as the Company's Chief Financial Officer ("CFO") and Executive Vice President since January 15, 2014.

17. Defendant Daniel F. Akerson ("Akerson") served as the Company's Chairman and CEO from September 1, 2010 to January 15, 2014.

18.     Defendant Daniel Ammann ("Ammann") has served as the Company's President since January 15, 2014, and served as CFO from April 1, 2011 to January 15, 2014 and as Executive Vice President from 2013 to January 15, 2014.

19.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

20.     General Motors Company designs, builds, and sells cars, trucks, crossovers, and automobile parts. The Company offers vehicle protection, parts, accessories, maintenance, satellite radio, and automotive financing. General Motors provides its vehicles and services worldwide.

### Materially False and Misleading Statements Issued During the Class Period

21.     The Class Period begins on February 27, 2012, when GM filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2011 (the "2011 10-K").  The 2011 10-K contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Akerson and Ammann, stating that the financial information contained in the 2011 10-K was accurate and

disclosed any material changes to the Company's internal control over financial reporting.

22.    In the 2011 10-K. the Company stated, in relevant part:

The federal government imposes stringent emission control requirements on vehicles sold in the U.S. and additional requirements are imposed by various state governments. These requirements include pre-production testing of vehicles, testing of vehicles after assembly, the imposition of emission defect and performance warranties and the obligation to recall and repair vehicles that do not comply with emissions requirements. We must obtain certification that the vehicles will meet emission requirements from the United States Environmental Protection Agency (EPA) before we can sell vehicles in the U.S. and Canada and from the California Air Resources Board (CARB) before we can sell vehicles in California and other states that have adopted the California emissions requirements.

We believe that our vehicles meet the current EPA and CARB requirements. If our vehicles do not comply with the emission standards or if defective emission control systems or components are discovered in such testing, or as part of government required defect reporting, we could incur substantial costs related to emissions recalls and possible fines. We expect that new CARB and federal requirements will increase the time and mileage periods over which manufacturers are responsible for a vehicle's emission performance.

23.    On February 15, 2013, GM filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2012 (the "2012 10-K"). The 2012 10-K contained signed certifications pursuant to SOX by Defendants Akerson and Ammann, stating that the financial information contained in the 2012 10-K was

accurate and disclosed any material changes to the Company's internal control over financial reporting.

24.     In the 2012 10-K, the Company stated the following in regards to its compliance with emissions requirements:

> The federal government imposes stringent emission control requirements on vehicles sold in the U.S. and additional requirements are imposed by various state governments. These requirements include pre-production testing of vehicles, testing of vehicles after assembly, the imposition of emission defect and performance warranties and the obligation to recall and repair vehicles that do not comply with emissions requirements. We must obtain certification that the vehicles will meet emission requirements from the United States Environmental Protection Agency (EPA) before we can sell vehicles in the U.S. and Canada and from the California Air Resources Board (CARB) before we can sell vehicles in California and other states that have adopted the California emissions requirements.

> We believe that our vehicles meet the current EPA and CARB requirements. If our vehicles do not comply with the emission standards or if defective emission control systems or components are discovered in such testing, or as part of government required defect reporting, we could incur substantial costs related to emissions recalls and possible fines. We expect that new CARB and federal requirements will increase the time and mileage periods over which manufacturers are responsible for a vehicle's emission performance.

25.     On February 6, 2014, GM filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2013 (the "2013 10-K").  The 2013 10-K contained signed certifications pursuant to SOX by Defendants Barra and Stevens, stating that the financial information contained in the 2013 10-K was accurate and

disclosed any material changes to the Company's internal control over financial reporting.

26.    In the 2013 10-K, the Company stated the following with regards to its compliance with emission requirements:

> The U.S. federal government imposes stringent emission control requirements on vehicles sold in the U.S. and additional requirements are imposed by various state governments. Canada's federal government is aligned with the U.S. federal requirements. These requirements include vehicle exhaust emission standards, vehicle evaporative emission standards and OBD system requirements. Each model year we must obtain certification for each test group that our vehicles will meet emission requirements from the U.S. Environmental Protection Agency (EPA) before we can sell vehicles in the U.S. and Canada and from the California Air Resources Board (CARB) before we can sell vehicles in California and other states that have adopted the California emissions requirements. Fleet-wide emissions compliance must also be achieved based on a sales-weighted fleet average.

> While we believe all our products are currently in compliance with EPA and CARB regulatory requirements, both agencies have ongoing "in-use" evaluations of compliance for products from all manufacturers. It is possible that we or either agency could identify potential non-compliance, which could lead to some type of field action to remedy the issue. Testing is conducted at various times. This includes pre-production testing of vehicles as part of certification and in-use testing of customer vehicles at specified mileages.

27.    On February 4, 2015, GM filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2014 (the "2014 10-K"). The 2014 10-K contained signed certifications pursuant to SOX by Defendants Barra and Stevens,

stating that the financial information contained in the 2014 10-K was accurate and disclosed any material changes to the Company's internal control over financial reporting.

28.    In the 2014 10-K, the Company stated the following with regards to its compliance with emission requirements:

> The U.S. federal government imposes stringent emission control requirements on vehicles sold in the U.S. and additional requirements are imposed by various state governments. Canada's federal government vehicle criteria emission requirements are generally aligned with the U.S. federal requirements. These requirements include vehicle exhaust emission standards, vehicle evaporative emission standards and OBD system requirements. Each model year we must obtain certification for each test group that our vehicles will meet emission requirements from the U.S. Environmental Protection Agency (EPA) before we can sell vehicles in the U.S. and Canada and from the California Air Resources Board (CARB) before we can sell vehicles in California and other states that have adopted the California emissions requirements.

> While we believe all our products are in compliance with EPA and CARB certification requirements, both agencies have ongoing "in-use" evaluations of compliance for products from all manufacturers. It is possible that we or either agency could identify potential non-compliance, which could lead to some type of field action to remedy the issue. Testing includes pre-production testing of vehicles as part of certification and in-use testing of customer vehicles at specified mileages.

29.    On February 3, 2016, GM filed an annual report on Form 10-K with the SEC, announcing the Company's financial and operating results for the quarter and fiscal year ended December 31, 2015 (the "2015 10-K").  The 2015 10-K contained signed certifications pursuant to SOX by Defendants Barra and Stevens,

stating that the financial information contained in the 2015 10-K was accurate and

disclosed any material changes to the Company's internal control over financial

reporting.

30.    In the 2015 10-K, the Company stated the following with regards to

its compliance with emission requirements:

> We are subject to laws and regulations that require us to control
> automotive emissions, including vehicle exhaust emission standards,
> vehicle evaporative emission standards and onboard diagnostic (OBD)
> system requirements. Advanced OBD systems are used to identify and
> diagnose problems with emission control systems. Problems detected
> by the OBD system and in-use compliance monitoring may increase
> warranty costs and the likelihood of recall. Emission and OBD
> requirements become more stringent each year as vehicles must meet
> lower emission standards and new diagnostics are required throughout
> the world without harmonization of global regulations. Zero emission
> vehicle (ZEV) requirements have been adopted by some U.S. states
> and there is the possibility that additional jurisdictions could adopt
> ZEV requirements in the future. While we believe all our products are
> designed and manufactured in material compliance with vehicle
> emissions requirements, regulatory authorities may conduct ongoing
> evaluations of the emissions compliance of products from all
> manufacturers. This includes vehicle emissions testing, including $CO_2$
> and nitrogen oxide emissions testing in Europe, and review of
> emission control strategies.

31.    On February 7, 2017, GM filed an annual report on Form 10-K with

the SEC, announcing the Company's financial and operating results for the quarter

and fiscal year ended December 31, 2016 (the "2016 10-K").  The 2016 10-K

contained signed certifications pursuant to SOX by Defendants Barra and Stevens,

stating that the financial information contained in the 2016 10-K was accurate and

disclosed any material changes to the Company's internal control over financial reporting.

32.     In the 2016 10-K, the Company stated the following with regards to its compliance with emission requirements:

> ***Automotive Emissions Control*** We are subject to laws and regulations that require us to control automotive emissions, including vehicle exhaust emission standards, vehicle evaporative emission standards and onboard diagnostic (OBD) system requirements. Advanced OBD systems are used to identify and diagnose problems with emission control systems. Problems detected by the OBD system and in-use compliance monitoring may increase warranty costs and the likelihood of recall. Emission and OBD requirements become more stringent each year as vehicles must meet lower emission standards and new diagnostics are required throughout the world with very little harmonization of global regulations. Zero emission vehicle (ZEV) requirements have been adopted by some U.S. states as well as the Canadian Province of Quebec and there is the possibility that additional jurisdictions could adopt ZEV requirements in the future. While we believe all our products are designed and manufactured in material compliance with substantially all vehicle emissions requirements, regulatory authorities may conduct ongoing evaluations of the emissions compliance of products from all manufacturers. This includes vehicle emissions testing, including CO2 and nitrogen oxide emissions testing, and review of emission control strategies.

33.     The statements referenced in ¶¶ 21-32 were materially false and misleading because Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operational and compliance policies. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (i) the Company installed at least three distinct defeat devices in over 700,000 trucks with Duramax diesel

engines from 2011 to 2016 in order to cheat emissions tests in the U.S.; (ii) consequently, the GM trucks at issue emit up to five times the legal limit of nitrogen oxide pollutants; and (iii) as a result of the foregoing, GM's public statements were materially false and misleading at all relevant times.

**The Truth Emerges**

34. On May 25, 2017, *Bloomberg* reported that a consumer lawsuit had been filed against GM for installing multiple defeat devices in two models of heavy-duty trucks with the Duramax diesel engine from 2011-2016. The lawsuit alleges that GM's unlawful, unfair, deceptive, and otherwise defective emission controls affect model year 2011-2016 GM Sierra 2500HD and 3500 HD trucks and GM Silverado 2500 HD and 3500 HD trucks.

35. According to the lawsuit, extensive testing of a 2013 Silverado 2500 diesel—a vehicle representative of the class of Duramax diesel engines present in both the Chevrolet Silverado and GMC Sierra model years 2011 to 2016— indicated as follows: (1) the vehicle produces emissions above the certification tests at temperatures above the certification range (86°F); (2) the vehicle produces higher emissions when temperatures are below the certification test range (68°F); and (3) the vehicle produces higher emissions occur after the vehicle has been run for 200-500 seconds of steady speed operation on average by a factor of 4.5 in all temperature windows. These test results confirmed the presence of three distinct

defeat devices, which enable the vehicle to meet emissions standards in the test temperature range, while allowing two to five times the legal amount of nitrogen-oxide pollutants to be emitted at all other times.

36.    On this news, GM's share price fell $0.60, or 1.81%, to close at $32.60 on May 25, 2017.

37.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

38.    Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired GM securities during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

39.    The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, GM securities were actively traded on the NYSE.  While the exact number of Class members is

14

unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by GM or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

40.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

41.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.  Plaintiff has no interests antagonistic to or in conflict with those of the Class.

42.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of GM;

- whether the Individual Defendants caused GM to issue false and misleading financial statements during the Class Period;

- whether Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of GM securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

43.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

44.    Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- GM securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NYSE and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiff and members of the Class purchased, acquired and/or sold GM securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

45.     Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

46.     Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## <u>COUNT I</u>

### (Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against All Defendants)

47.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

48.     This Count is asserted against Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

17

49.     During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiff and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities.  Such scheme was intended to, and, throughout the Class Period, did:  (i) deceive the investing public, including Plaintiff and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of GM securities; and (iii) cause Plaintiff and other members of the Class to purchase or otherwise acquire GM securities and options at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

50.     Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for

GM securities.  Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about GM finances and business prospects.

51.     By virtue of their positions at GM, Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiff and the other members of the Class, or, in the alternative, Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to Defendants.  Said acts and omissions of Defendants were committed willfully or with reckless disregard for the truth.  In addition, each Defendant knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

52.     Information showing that Defendants acted knowingly or with reckless disregard for the truth is peculiarly within Defendants' knowledge and control.  As the senior managers and/or directors of GM, the Individual Defendants had knowledge of the details of GM internal affairs.

53.     The Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.  Because of their positions of control and authority, the Individual Defendants were able to and did, directly or indirectly,

control the content of the statements of GM.  As officers and/or directors of a publicly-held company, the Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to GM businesses, operations, future financial condition and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of GM securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning GM business and financial condition which were concealed by Defendants, Plaintiff and the other members of the Class purchased or otherwise acquired GM securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by Defendants, and were damaged thereby.

54.     During the Class Period, GM securities were traded on an active and efficient market.  Plaintiff and the other members of the Class, relying on the materially false and misleading statements described herein, which the Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of GM securities at prices artificially inflated by Defendants' wrongful conduct.  Had Plaintiff and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them

at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiff and the Class, the true value of GM securities was substantially lower than the prices paid by Plaintiff and the other members of the Class. The market price of GM securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiff and Class members.

55.   By reason of the conduct alleged herein, Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

56.   As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases, acquisitions and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

### (Violations of Section 20(a) of the Exchange Act Against The Individual Defendants)

57.   Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

58.   During the Class Period, the Individual Defendants participated in the operation and management of GM, and conducted and participated, directly and

indirectly, in the conduct of GM business affairs.   Because of their senior positions, they knew the adverse non-public information about GM misstatement of income and expenses and false financial statements.

59.   As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to GM financial condition and results of operations, and to correct promptly any public statements issued by GM which had become materially false or misleading.

60.   Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which GM disseminated in the marketplace during the Class Period concerning GM results of operations. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause GM to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of GM within the meaning of Section 20(a) of the Exchange Act.   In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of GM securities.

61.   Each of the Individual Defendants, therefore, acted as a controlling person of GM.   By reason of their senior management positions and/or being

22

directors of GM, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, GM to engage in the unlawful acts and conduct complained of herein.   Each of the Individual Defendants exercised control over the general operations of GM and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

62.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by GM.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B.    Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.      Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: July 5, 2017

Respectfully submitted,

*/s/ Paul F. Novak*
Paul F. Novak (P39524)
Gregory Stamatopoulos (P74199)
**WEITZ & LUXENBERG, P.C.**
Chrysler House
719 Griswold Street, Suite 620
Detroit, Michigan 48826
Telephone: (313) 800-4170
Facsimile:  (646) 293-7992
Email:  pnovak@weitzlux.com
            gstamatopoulos@weitzlux.com

**POMERANTZ LLP**
Jeremy A. Lieberman
J. Alexander Hood II
Hui M. Chang
600 Third Avenue, 20th Floor
New York, New York 10016
Telephone:  (212) 661-1100
Facsimile:  (212) 661-8665
Email:  jalieberman@pomlaw.com
            ahood@pomlaw.com
            hchang@pomlaw.com

**POMERANTZ LLP**
Patrick V. Dahlstrom
10 South La Salle Street, Suite 3505
Chicago, Illinois 60603

24

Telephone:  (312) 377-1181
Facsimile:   (312) 377-1184
Email:  pdahlstrom@pomlaw.com

**BRONSTEIN, GEWIRTZ**
**& GROSSMAN, LLC**
Peretz Bronstein
60 East 42nd Street, Suite 4600
New York, NY 10165
Telephone: (212) 697-6484
Facsimile (212) 697-7296
Email:  peretz@bgandg.com

*Attorneys for Plaintiff*